UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Shawn Liggons,                                               Case No. 3:20-cv-1208

             Plaintiff,

v.                                                             MEMORANDUM OPINION
                                                                              AND ORDER

General Motors, LLC, *et al.*,

             Defendants.

### I. INTRODUCTION

Defendants General Motors, LLC ("GM") and United Automobile, Aerospace and Agricultural Implement Workers of America, Local 14 (the "Union") seek summary judgment on Plaintiff Shawn Liggons' claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1] (Doc. Nos. 42 and 43). Liggons filed briefs in response to Defendants' motions. (Doc. Nos. 50 and 55). Defendants filed briefs in reply. (Doc. Nos. 53, 54, 59, and 60). For the reasons stated below, I grant Defendants' motions.

### II. BACKGROUND

Liggons is an African American male who began working at GM as a temporary employee before being hired on a permanent basis in February 2016. (Doc. No. 39 at 62-63). He became a member of the Union at the same time as he became a permanent GM employee. (*Id.* at 64). With

---

[1] I previously dismissed Liggons' discrimination claims against both Defendants. (Doc. Nos. 16 and 24).

the exception of one lay-off period in 2018 and a Covid-19 related shutdown in the spring of 2020, Liggons worked as a quality operator on assembly lines throughout GM's Toledo, Ohio plant until his termination on January 7, 2021.[2] (*Id.* at 66-69).

The parties' dispute in this case arises primarily from discipline Liggons received for violating GM's attendance policies. The parties agree there are two applicable attendance policies – Doc. 8 and Shop Rule 9. Absences of less than four hours are governed by Shop Rule 9, which was adopted pursuant to a Local Memorandum of Understanding between the Union and the Toledo GM plant dated October 4, 2007. ( Doc. No. 39 at 242-44). Shop Rule 9 prohibits employees from "[r]eporting late to work." (*Id.* at 244).

Doc. 8, more formally known as the Memorandum of Understanding – Special Procedure for Attendance, is a collectively bargained attendance policy governing unexcused absences of four hours or more. (*Id.* at 235-41). Doc. 8 contains a progressive discipline system under which an employee's first and second unexcused absences lead to a written warning. (*Id.* at 240). Beginning with the third unexcused absence, an employee will be suspended for the remainder of the shift plus an additional period. (*Id.*). If an employee accumulates six unexcused absences at one time, the employee's employment may be terminated. (*Id.* at 240-41).

Absences are removed from the employee's record after specific periods of time. (*Id.*). The first unexcused absence remains on the employee's record for six months, as long as the employee does not accumulate any other unexcused absences. A second accumulated unexcused absence

---

[2] Liggons' employment was terminated after this case began, as the result of his alleged violation of a GM policy prohibiting audio or video recordings without prior GM approval. (*See* Doc. No. 50 at 8-9). Liggons did not seek leave to amend his complaint to include any claim arising from his termination and, therefore, the circumstances surrounding his termination are not relevant to his remaining claim of retaliation. *See Tucker v. Union of Needletrades, Indus., and Textile Emps.*, 407 F.3d 784, 788-89 (6th Cir. 2005) (holding a plaintiff may not defeat summary judgment by asserting claims which have never been pled).

increases the time period to twelve months, and the time on record period increases to eighteen months with the third unexcused absence. (*Id.*).

Liggons received his first written warning pursuant to Doc. 8 for an unexcused absence on July 11, 2016, and his second a few months later, on November 17, 2016. (Doc. No. 41-4). Liggons believed this discipline was improper, asserting he had used paid and FMLA leave for the two absences. (*See* Doc. No. 50 at 11). Then, on August 16, 2017, GM suspended Liggons for the remainder of his shift as well as the next seven days following his third unexcused absence, pursuant to Doc. 8. (Doc. No. 41-4). Liggons had missed work due to a death in his family and did not have any available vacation days to use. He asserted the suspension was improper because, including weekends, it amounted to an eleven-day suspension. (*See* Doc. No. 50 at 11).

A little over a month later, on October 5, 2017, Liggons filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging GM discriminated against him on the basis of his race when he was suspended for violating Doc. 8. (Doc. No. 39 at 185-87). Liggons alleged employees who were not members of the same race were treated more favorably when they violated GM's attendance policies. (*Id.* at 185). The OCRC issued a letter of determination on July 30, 2018, stating its conclusion that it was not probable that GM discriminated against Liggons and dismissing his charge. (*Id.* at 186-87).

On January 12, 2018, Liggons reported late to work and received a suspension pursuant to Shop Rule 9 as a result.[3] (*See* Doc. No. 49-45 at 1). He contended he was late only because of a severe winter storm, and that the October 4, 2017 Local Memorandum of Understanding states "a

---

[3] It is unclear from the record whether this suspension was for two weeks, (*see* Doc. No. 39 at 291), or thirty days. (*See* Doc. No. 49-45 at 1). But this uncertainty does not create a genuine dispute of material fact sufficient to defeat Defendants' motions, as no one disputes that Liggons in fact was disciplined because he was late.

3

rule of reason [regarding whether an absence will be treated as excused or unexcused] will apply in instances of extreme snow or ice even if a driving ban is not ordered [by a law enforcement agency]." (Doc. No. 39 at 242). Liggons asserted he should not have been disciplined for reporting late to work due to weather conditions outside of his control, though he acknowledged Shop Rule 9 does not require GM to convert unexcused tardiness into an excused absence due to weather conditions. (Doc. No. 39 at 146-48).

Liggons filed a charge of discrimination regarding this suspension on April 30, 2018, alleging the suspension was issued due to unlawful race discrimination and in retaliation for his October 5, 2017 charge of discrimination. (*Id.* at 188). The OCRC dismissed this charge on February 21, 2019, after concluding Liggons' allegations of discrimination and retaliation were not probable. (*Id.* at 189-90).

On April 10, 2019, GM issued two separate suspensions pursuant to Doc. 8. Liggons first was suspended for two weeks for unexcused absences on March 29, 2019, and April 1, 2019. (*Id.* at 289). He then was given a thirty-day suspension for unexcused absences on April 3, 2019, and April 4, 2019. (*Id.* at 290). The Union did not pursue a grievance on Liggons' behalf regarding these suspensions because it concluded GM had correctly applied Doc. 8. (Doc. No. 43-3).

Liggons filed his third OCRC charge on May 29, 2019. (Doc. No. 39 at 191). But this charge did not relate to the April 10, 2019 suspensions. Instead, in this charge, Liggons asserted GM had discriminated against him due to his race and disability, and retaliated against him for his previous OCRC filings, when GM refused to authorize an annual pay raise. (*Id.*).

Liggons' third OCRC charge involved allegations that GM did not correctly apply the terms of the 2011 Collective Bargaining Agreement (the "2011 CBA") between GM and the Union. Pursuant to the 2011 CBA, (Doc. No. 49-11 at 1), GM and the Union agreed to a Memorandum of

4

Understanding (the "Wage MOU") covering advancement to different wage and benefit levels. (Doc. No. 41-1).

The Wage MOU provided starting and maximum rates of pay and established hourly wage increases of $1-2 every 52 weeks. (*Id.* at 2-3). Employees gained one week's credit toward the next wage level for each week in which they worked. (Doc. No. 49-11 at 1). Conversely, employees did not receive credit "for any week during which for any reason[] the employee does not work." (*Id.*).[4] "[F]ull weeks of time lost for vacation during the Plant Vacation Shutdown Week(s), bereavement, military duty[,] and Family [and] Medical Leave Act, if the employee would otherwise have been scheduled to work, will be considered as time worked." (*Id.* at 2).

The Union assisted Liggons with filing grievances in March 2018 and March 2019, after he did not receive wage increases on the yearly anniversary on his hiring date. (Doc. No. 39 at 293-94). Both grievances were denied because Liggons had not received 52 weeks of credit within each calendar year, as required by the Wage MOU and the 2011 CBA. (*Id.*). The Union determined GM had appropriately calculated Liggons' length of service for calculation of his service time for pay raises because Liggons' suspensions resulted in full weeks of time lost. (Doc. No. 43-2 at 2). Consequently, the Union did not advance the grievances to additional steps in the grievance process. (*Id.*). Liggons later withdrew his third OCRC charge in November 2019, before the OCRC concluded its investigation. (Doc. No. 39 at 192-93).

Liggons filed two other OCRC charges in August 2020. (*Id.* at 198-203). Both OCRC charges allege harassment by a co-worker, Jeff King. Liggons stated that, on February 10, 2020, King prevented him from entering the plant and made him go back to security so that he could

---

[4] Liggons claims these provisions of the 2011 CBA do not apply to him. (Doc. No. 50 at 13). But he does not explain why, and there is nothing within the 2011 CBA which appears to exempt Liggons from coverage. Paragraph 99 of the 2011 CBA states the wage policies do not apply to skilled trades job classification, (Doc. No. 49-11 at 2), but there is no evidence that Liggons' position was classified as a skilled trade job.

enter the building, even though he already had been cleared by security. (*Id.* at 196, 200). Liggons filed a complaint with GM about the incident, claiming King discriminated against him and harassed him by blocking him from going into the plant. (Doc. No. 53-1 at 4). Liggons had forgotten his keycard that day and checked in with the security office upon arriving at the plant. (*Id.* at 8). GM investigated the incident and determined King had not observed security authorize Liggons' entry into the building. (*Id.*). GM also concluded King did not make physical contact with Liggons to prevent him from entering the plant. (*Id.*).

Liggons' fourth OCRC charge also alleged racial discrimination and retaliation based upon GM's alleged demotion of Liggons from a team leader position. (Doc. No. 39 at 196). According to Liggons, he took a test to become a team leader in December 2019 and missed 2 of 20 questions. He asserts he worked as a team leader from December 2019 until February 15, 2020, when he went on a medical leave. (*Id.*). While Liggons was on leave, the Toledo plant shut down due to the Covid-19 pandemic. When Liggons returned to work in May 2020, he allegedly was told he failed the test and would no longer be a team leader. (*Id.*). The OCRC dismissed these charges as not probable on March 11, 2021. (*Id.* at 202).

In sum, Liggons filed a total of five OCRC charges which are relevant to this litigation:

- Charge dated October 5, 2017, alleging discrimination arising out of August 16, 2017 suspension for his third unexcused absence under Doc. 8;

- Charge dated April 30, 2018, alleging discrimination and retaliation arising out of January 12, 2018 suspension for unexcused tardiness in violation of Shop Rule 9;

- Charge dated May 29, 2019, alleging discrimination and retaliation arising out of application of pay raise policy in 2018 and 2019;

- Two charges dated August 3, 2020, alleging discrimination and retaliation arising out of King's alleged refusal to allow Liggons to enter the facility and Liggons' alleged removal from a team leader position.

(Doc. No. 39 at 185-202).

Liggons initiated this litigation on June 2, 2020, shortly after his return to work at GM. (Doc. No. 1). Liggons asserted claims for race and disability discrimination against GM and the Union, which I dismissed as untimely hybrid § 301 / fair representation claims. (Doc. Nos. 16 and 24). His fourth cause of action, alleging GM and the Union engaged in a "pattern of ongoing retaliation against him for engaging in protected activities in violation of Title VII of the Civil Rights Act . . ." remains. (Doc. No. 1 at 12-13).

### III.  STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.  ANALYSIS

Liggons seeks to prove his retaliation claim through circumstantial evidence. (*See* Doc. No. 50 at 17-20). Therefore, under the *McDonnell Douglas* burden-shifting framework, he has the initial burden of establishing a prima facie case of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The prima facie stage requires that Liggons point to evidence showing: "'(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed

7

between the protected activity and the materially adverse action.'" *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns,* 264 F. App'x 463, 466 (6th Cir. 2007)) (further citation omitted).

If Liggons establishes a prima facie case, the burden of production shifts to the Defendants to identify a legitimate, non-discriminatory reason for the materially adverse actions. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). The burden then returns to Liggons to show that the Defendants' proffered reason is a pretext for discrimination. *Id.*

GM argues Liggons cannot establish the second or fourth prongs of his prima facie case. (Doc. No. 42 at 15). The Union asserts Liggons cannot establish the third or fourth prongs of his prima facie case as to his retaliation claim against it. (Doc. No. 43-1 at 15-22). I conclude Liggons has not established a prima facie case against either Defendant, and I grant the motions for summary judgment.

### A. Protected Activity

"Title VII broadly protects an employee's participation 'in any manner in an investigation, proceeding, or hearing under . . . [Title VII]'" and also "protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge." *Abbott*, 348 F.3d at 542-43 (quoting 42 U.S.C. § 2000e-3(a) and citing cases). Neither Defendant disputes that Liggons engaged in protective activity when he filed charges of discrimination with the OCRC and, therefore, he has established the first prong of his prima facie case.

Liggons also contends he engaged in protected activity when he filed grievances challenging his suspensions and GM's pay determinations, as well as when he made an internal complaint about harassment by a coworker. (Doc. No. 50 at 19). But those actions do not implicate pending EEOC or OCRC proceedings and, therefore, they do not constitute protected activity. *See Abbott*, 348 F.3d at 543 ("The participation clause protects an employee's activities that 'occur in conjunction with or

8

after the filing of a formal charge with the EEOC,' not an employee's participation 'in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC.'") (quoting *EEOC v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1174 (11th Cir. 2000)).

> **B.  Knowledge of Protected Activity**

The second prong of the prima facie case requires proof that the employer knew of the employee's protected activity.  A plaintiff may establish this prong through circumstantial evidence, such as "actions or statements from the employer suggesting that the employer knew that the plaintiff had engaged in protected activity," or "evidence of prior interaction of individuals with such knowledge and those taking the adverse employment action."  *Highfield v. City of Vanceburg, Ky.*, --- F. Supp. 3d ---, No. CV 0:21-052-DCR, 2022 WL 17327842, at *14-*15 (E.D. Ky. Nov. 29, 2022) (citing cases) (internal quotation marks omitted).

GM first contends Liggons has not offered any evidence to show the relevant decisionmakers knew of his protected activity before taking any materially adverse actions.

Liggons argued in response:

> The cat's paw theory holds that an employer can be liable for unlawful retaliation or discrimination even when the decisionmaker did not act with a discriminatory or retaliatory motive if he/she was influenced by another employee who did have a discriminatory or retaliatory motive.  Plaintiff gives a descriptive account of individual involved in his discipline, wages and demotion along with their interaction between upper management, lower management (supervisors), union officials, security and back to Plaintiff during his interrogatories.

(Doc. No. 50 at 20) (citing Doc. No. 40 at 140-42).

Under the cat's paw theory of liability, an employer may be held liable for a supervisor's discriminatory conduct toward the plaintiff if the plaintiff provides proof of a "causal nexus" between the supervisor's discriminatory animus and the ultimate decisionmaker's decision to discipline the plaintiff.  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350-51 (6th Cir. 2012) (citations and internal quotation marks omitted).  A plaintiff pursuing a cat's paw theory of liability

9

must show a supervisor engaged in discriminatory conduct and that discriminatory conduct was a proximate cause of the ultimate materially adverse action. *Id.* at 351.

But Liggons' argument and citation do not establish that any decisionmaker knew of his protected activity or was influenced by someone who did. Liggons produced the names of 27 individuals who might have knowledge of the events that led to the discipline he received, and which eventually formed the basis for his OCRC charges. (Doc. No. 40 at 140-42). But he does not identify which, if any, of those individuals knew of the OCRC charges themselves. GM met its Rule 56 burden by demonstrating the absence of evidence supporting an essential element of Liggons' claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is Liggons' duty to identify specific material facts from which a jury could rule in his favor, *Anderson*, 477 U.S. at 250, and he has not done so with respect to GM's alleged knowledge of his protected activity.

### C. Materially Adverse Action

The third prong of the prima facie case requires that the plaintiff present proof of a materially adverse action, which is an action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). The Supreme Court specifically tied this standard "to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id.* at 69.

The Union argues Liggons has not identified any evidence that it took any adverse action against him, much less one that rises to the level of a "materially adverse action." (Doc. No. 43-1 at 16).

Liggons claims the Union did not adequately support him in response to the discipline he received from GM. (Doc. No. 55 at 25). He asserts his belief that "every discipline [he] receive[d] was materially adverse and retaliatory," and he contends the Union denied him the opportunity to

file grievances after his August 16, 2017 and April 10, 2019 disciplinary notices. (*Id.*). But Liggons' beliefs about GM's disciplinary actions[5] fail to show the Union took a materially adverse action against him. And even if I were to assume Liggons could produce evidence to show the Union prevented him from filing grievances pursuant to the CBA, he fails to show how that conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" to the EEOC or OCRC. *Burlington N.*, 548 U.S. at 68. Therefore, I conclude Liggons fails to establish there is a genuine dispute of material fact as to the third prong of his retaliation claim against the Union.

        **D.**     **Causal Connection**

Finally, to prove causation, Liggons must show his protected activity "was a 'but for' cause" for a materially adverse action, "meaning the adverse action would not have occurred absent the [Defendants'] desire to retaliate." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013)).

Both Defendants contend Liggons cannot establish a causal connection between any materially adverse action and his protected activity. (Doc. No. 42 at 17; Doc. No. 43-1 at 21-22).

Liggons implies he can establish a causal connection through temporal proximity. (*See, e.g.,* Doc. No. 50 at 19) (referencing October 2017 OCRC charge and January 2018 suspension). In some cases, where a materially adverse action "'occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" *George*, 966 F.3d at 460 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). But those cases involved a materially adverse action "taken just days or weeks from when the employer learns of the employee's protected activity." *George*, 966 F.3d at 460 (citing cases).

---

[5]   GM does not dispute that the suspensions Liggons received constitute materially adverse actions.

11

In this case, not only is there no evidence showing if or when any decisionmaker with GM or the Union received notice of Liggons' protected activity, but also the protected activity occurred either after or months before the materially adverse action. Liggons filed his first OCRC charge in October 2017. (Doc. No. 39 at 185). The next materially adverse action occurred over three months later, in mid-January 2018, when he was suspended pursuant to Shop Rule 9 for tardiness. He filed an OCRC charge regarding that disciplinary suspension on April 30, 2018. (*Id.* at 188). He does not identify another materially adverse action until April 2019, when he received two Doc. 8 suspensions. Liggons filed his third OCRC over a month later on May 29, 2019, (*id.* at 191), but he does not identify another materially adverse action prior to May 2020, when he allegedly was demoted from a team leader position.

The passage of time alone does not "categorically preclude[] [a] finding [of] causation." *Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 341 (6th Cir. 2015). Liggons still may establish a genuine dispute of material fact by coupling evidence of temporal proximity with "other evidence of retaliatory conduct." *Mickey*, 516 F.3d at 525. But his belief that the Defendants' actions were retaliatory, (Doc. No. 55 at 25), is unsupported by any evidence in the record. Therefore, I conclude he fails to establish a genuine dispute of material fact as to the fourth prong of his prima facie case.

Defendants have established that Liggons cannot meet the second and fourth prongs of the prima facie case of his retaliation claim against GM or the third and fourth prongs of his prima facie case against the Union. Therefore, I conclude Defendants are entitled to summary judgment in their favor as a matter of law.

## V. CONCLUSION

For the reasons stated above, I grant Defendants' motions for summary judgment. (Doc. Nos. 42 and 43).

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge